**EXHIBIT 3**

FINRA ARBITRATION
NEW YORK, NEW YORK
---------------------------------------------------------------------- X

In the Matter of the arbitration between:            :        Case No.:

Clifford Gelman, M.D.,                               :

                              Claimant,              :

                  -against-                          :

LPL Financial LLC, Thomas Joseph Borruso and Wexford :
Financial Strategies,
                                                     :
                              Respondents.
---------------------------------------------------------------------- X


## STATEMENT OF CLAIM

Clifford Gelman, M.D. ("Dr. Gelman") asserts the following as his statement of claim.

**I.    PRELIMINARY STATEMENT**

1.      In reliance on the investment advice of Respondents, Dr. Gelman lost almost the entire value of his retirement savings, an account worth $404,382.00 when he invested it on or about June 13, 2015 with Respondents LPL Financial LLC ("LPL"), Wexford Financial Strategies ("Wexford"), and Thomas Joseph Borruso ("Borruso"). Although Respondents knew that Dr. Gelman's investment account was for retirement, and that his objectives were growth and income, Respondents invested his money in speculative stocks that were unsuitable to his goals. Those investments caused Dr. Gelman to sustain enormous losses.

2.      Ultimately, Respondents concentrated virtually all of Dr. Gelman's funds in the stock of a single, solar energy company, SunEdison, without obtaining his approval to do so.

SunEdison went bankrupt, and Dr. Gelman sustained huge losses based on Respondents' unauthorized concentration of his funds in that stock.

3.      Respondents also churned Dr. Gelman's account, making excessive trades that lost money for Dr. Gelman, while generating large commissions for Respondents.  By the time Respondents concluded their trading spree, Dr. Gelman had only $12,734.09, but Respondents had earned over $32,000 in commissions.

4.      LPL and Wexford allowed this to happen by their failure to supervise Borruso, whom LPL and Wexford employed as their registered representative.  On September 5, 2017, Mr. Borruso was permanently barred from association with any FINRA member in any capacity.

5.      Had Respondents invested Dr. Gelman's funds in an S&P 500 index fund, which would have matched Dr. Gelman's goals of growth and income, his retirement account would be worth approximately $540,608 as of March 27, 2018.  Dr. Gelman's well-managed account loss is $527,874, which is the difference between what he would have earned had his funds been properly invested ($540,608), and the $12,734 that remained after Respondents' mismanagement of his funds.  Dr. Gelman seeks to recover his well-managed account losses as compensatory damages, as well as the costs and fees of this proceeding, including attorneys' fees, and the lost tax benefits he would have received had his funds continued to be invested in his retirement plan.

6.      In addition, Dr. Gelman seeks punitive damages in the amount of $5,000,000 because of Respondents' gross misconduct in causing the loss of virtually his entire retirement account by concentrating all of his funds in the stock of one speculative company, in disregard of his investment objectives, and in an extreme departure from acceptable commercial practices. Punitive damages against LPL are also merited because of its gross negligence in failing to supervise Dr. Gelman's account.  LPL could have prevented Dr. Gelman's losses through proper

supervision.  However, despite scores of prior cases in which LPL consented to findings of

failure to supervise and to fines, penalties and other payments in the amount of $47,830,816.37,

LPL failed to take adequate measures to correct its systemic and longstanding failure to

supervise.  LPL's failure to provide adequate supervision, in the face of these numerous prior

findings, shows that compensatory damages alone are inadequate to persuade LPL to implement

the supervision that is mandatory under FINRA's rules to protect its customers from harm.  Only

a large award of punitive damages will cause LPL and the other Respondents to correct their

conduct.

## II.     THE PARTIES

### A.     Claimant

7.     Claimant Dr. Gelman is a surgeon, currently residing in Pismo Beach, California.

At the time of the events relevant to this Statement of Claim, Dr. Gelman lived and worked in

Melbourne Beach, Florida.

8.     Dr. Gelman graduated from college in 1984 with a degree in biology, and

graduated from medical school in 1989.  He then worked as a medical intern and a resident,

before joining the Air Force where he served for 3 years as a surgeon.

9.     Dr. Gelman has no training or experience in finance and has very limited

experience as an investor.  At the time of the transactions that are the subject of this Statement of

Claim, he owned a home, a rental property, and shares in a physicians group which invested in

office buildings for medical practitioners.  He also had a retirement account through a 401k plan,

containing all his retirement savings, which he used to fund the retirement accounts with LPL

through a transfer of assets.  Prior to transferring the retirement account to LPL, he invested his

retirement account in a mix mutual funds reflecting a strategy that focused on long term capital appreciation with a smaller investment in funds focused in whole or part on income generation.

**B.    Respondents**

10.    On information and belief, Respondent LPL is the second largest independent broker-dealer in the United States.  On its website, it claims that as of December 31, 2017, it had 15,210 financial advisors, $615 billion in advisory and brokerage assets, net revenue for 2016 of $4.281 billion and net income of $191,931,000 for fiscal year 2016.  It is a member of FINRA/SIPC.  Its headquarters are located in Boston, Massachusetts.

11.    On information and belief, Respondent Wexford is a firm of financial planners and advisors, affiliated with LPL, and offering securities and financial planning through LPL. According to its web site, Wexford's offices are currently located on Long Island, in Melville, New York.  On information and belief, during the time of the transactions that are the subject of this statement of claim, Wexford also had offices located on Long Island in Woodbury, New York.

12.    Respondent Borruso is a former registered representative and employee of LPL, who was also affiliated with Wexford, and who worked from an office on Long Island in Woodbury, New York.  Subsequent to the events described in this Statement of Claim, FINRA took regulatory action against Borruso permanently barring him from association with any FINRA member in any capacity.  On information and belief, FINRA took this disciplinary action against Mr. Borruso in whole or in part because of the losses he caused Dr. Gelman and others to sustain in his accounts with LPL and Wexford that are the subject of this Statement of Claim.

13.     LPL's account opening letters describe Respondent Borruso as a Financial Advisor.  On its web site, LPL describes how its advisors offer "The Benefits of Objective Guidance," stating:

- "At LPL, we provide all the tools advisors need to offer you objective advice, including exceptional research and administrative support for tracking and monitoring account performance."

- "[Y]our LPL advisor can construct individual investment portfolios by using our research on the economy and a range of other investment-related topics.  We offer no proprietary investment products and have no investment banking operations. As a result, our financial advisors are able to make informed recommendations based on objective research and your individual needs."

- "We believe advisors backed by LPL have a greater understanding of the economy and markets, more time to evaluate financial strategies, and greater access to comprehensive information."

- "At LPL, we understand the important role a financial advisor can play in managing your total financial life.  That's why we provide our financial advisors with the tools they need to help you pursue your goals."

- "When you choose an advisor supported by the vast resources of LPL, you can be confident that your advisor will have access to independent research, state-of-the art technology, innovative investment tools, and the exceptional support that allow your advisor to devote his or her full attention to your needs and objectives."

14.     While Borruso was a registered representative with LPL he was a covered person under LPL's Code of Ethics.  LPL's Code of Ethics provides that "Covered Persons have a fiduciary obligation to act in the best interest of the client at all times."

## III.   RESPONDENTS SOLICIT DR. GELMAN'S ACCOUNT

15.     Sometime prior to March 11, 2015, Dr. Gelman received an unsolicited telephone call from Respondent Borruso.  Mr. Borruso stated that he was a financial advisor who worked only with doctors.  Mr. Borruso said that doctors are too busy to manage their investments actively.  He said that he could manage Dr. Gelman's investments to maximize returns.  He said he would employ a more dynamic strategy and claimed that his dynamic strategy had a lot of success.

16.     During that initial call Dr. Gelman told Borruso that he was not knowledgeable about investing and did not have time to follow stock reports and read prospectuses.  He said he wanted a manager who knows what he is doing so that Dr. Gelman did not have to get involved in managing his own investments.  Based on these discussions, Dr. Gelman decided to move his retirement investments to LPL so that Borruso could manage them.

17.     On or about March 11, 2015, Respondent Borruso opened an account for Dr. Gelman with LPL under the account number 1591-0705 ("Account 0705").  LPL's welcome letter described the account as "Brokerage – Non Retirement" and listed Dr. Gelman's investment objective as "Growth with Income," which it defined in the following terms: "Emphasis is placed on modest capital growth with some focus on generation of current income."  The welcome letter listed the different investment objectives in order from lowest risk to highest risk, placing "Growth with Income" in the lower half of the available objectives in terms of risk.  The welcome letter identified Respondent Borruso as the Financial Advisor. Although the welcome letter is dated March 11, 2015, Dr. Gelman never funded the account.

Nonetheless, account statements show that Respondents used this account to purchase shares in SunEdison, shortly before it went bankrupt, taking unauthorized long positions for Dr. Gelman by extending credit without Dr. Gelman's approval of the extension of credit or the purchase of shares, selling those shares at losses, and then issuing unexplained credits to the account in the amount of the losses.

18.      On or about June 13, 2015, Respondent Borruso opened an account for Dr. Gelman with LPL under the account number 5125-8128 ("Account 8128").  LPL's monthly statements describe Account 8128 as a retirement account and describe the investment objective as "Growth with Income."  Upon opening the account, Dr. Gelman transferred $383,071.55 from his IRA Rollover account to LPL.

19.      Also on or about June 13, 2015, Respondent Borruso opened an account for Dr. Gelman with LPL under the account number 3096-4125.  The welcome letter lists Respondent Borruso as the Financial Advisor, describes the account as "Brokerage – Retirement" and describes the investment objective as "Growth with Income."  Dr. Gelman funded the account on July 2, 2015 by transferring 632.17 shares of Vanguard Strategic Equity Investor CL.  On LPL's statement for that account for the period from July 1 through July 31, 2015, LPL valued those shares at $21,310.45.

IV.      **RESPONDENTS' WRONGFUL ACTIONS**

A.      **Respondents Churn Dr. Gelman's Account**

20.      Beginning in August, 2015, Respondents began a reckless spree of stock purchases.  Between August 1, 2015 and March 31, 2016, an eight month period, respondents purchased securities through the three accounts at a cost of $1,486,810.  During this same period, the average monthly ending value of the three accounts was $262,773.  This is a turnover ratio of 8.5.  Under governing legal authorities, turnover ratios in excess of 6 are conclusive evidence of

churning.  The evidence is incontrovertible that Respondents churned Dr. Gelman's account in violation of the law.

21.     The churning was evident long before March 31, 2016.  For the month of August 2015, the turnover ratio was 6.8.  For the month of October, 2015, the turnover ratio was 24.  For the three month period ending October 30, 2015, the turnover ratio was 11.

22.     If LPL or Wexford had examined the turnover ratio at any point in time during this period, it would have seen clear evidence of churning.  Their failure to stop Borruso from his excessive churning in light of this clear evidence shows either:  (1) that LPL and Wexford did not check on the trading in the account, which is a failure to supervise, or (2) if they did check on the trading in the account, they failed to act, again failing in their duty of supervision.  At a minimum, this shows gross negligence on the part of LPL and Wexford.

23.     When Dr. Gelman saw the large amount of trading that Borruso had executed in Dr. Gelman's account, and saw the substantial commissions it was generating for Respondents, he raised his concerns with Borruso in a telephone conversation.  Borruso provided reassurances, stating that Dr. Gelman's returns would greatly surpass all commission fees and that the dynamic nature of Borruso's management strategy was to buy and sell actively, following market indicators.

24.     These reassurances proved false.  As a result of Respondents' mismanagement of Dr. Gelman's funds, the value of Dr. Gelman's accounts fell from $404,382.00 to $12,734.09.

25.     The churning of Dr. Gelman's account yielded $32,515.32 in commissions for Respondents.

**B.     Respondents Make Unsuitable Investments for Dr. Gelman.**

26.     Churning was not the only violation of the law and of Dr. Gelman's rights.  Borruso also made recommendations and purchases for Dr. Gelman that were unsuitable to Dr.

Gelman's investment objectives of investing for retirement with an objective of growth with income.  Trading records show that Borruso invested Dr. Gelman's money in risky put and call options on stocks.  Borruso also bought large amount of stocks in the technology sector, including startup companies, through purchases in over-the-counter markets.  Borruso, solicited and recommended all of these investments.  In addition, Borruso took long positions on the stock of SunEdison and other companies without Dr. Gelman's approval.

27.     The investments that Borruso recommended and made on behalf of Dr. Gelman are the type of investments that match the objectives that LPL describes in its literature as "Trading" or "Aggressive Growth," which were unsuitable for Dr. Gelman's objective of growth with income for retirement.  They are the two most aggressive investment strategies according to LPL's welcome letter.  LPL's welcome letter defined Trading as "Emphasis is placed on speculative transaction activity.  This objective represents acceptance of an extremely high level of risk (not allowed in advisory accounts)."  The welcome letter defines Aggressive Growth as "Emphasis is placed on aggressive growth and maximum capital appreciation.  No focus on generation of current income.  This objective has a very high level of risk and is for investors with a longer time horizon."  This is clearly inconsistent with time horizon stated in the welcome letter for Dr. Gelman, which was "5-10 Years."

28.     Ultimately, Borruso invested virtually all of the funds in Dr. Gelman's accounts at LPL in the stock of one company, SunEdison, and made additional investments in SunEdison on margin without Dr. Gelman's approval.  Borruso recommended and solicited Dr. Gelman's investment in Sun Edison, but he never told Dr. Gelman he would be investing virtually all of the money in his accounts in that one stock, nor did he tell Dr. Gelman that he would be taking margin loans in Dr. Gelman's account to make additional investments in SunEdison.

29.     Borruso told Dr. Gelman that LPL would send him letters about the risk of investing in SunEdison's stock, but that he should ignore the letters because Borruso had approved the stock.  Borruso said that SunEdison's stock was underpriced, and said it was similar to other stocks in which he had invested in the past, and which had rebounded to yield substantial investment gains for his customers.  Borruso told Dr. Gelman that securities industry leaders were investing in SunEdison, that SunEdison had long term contracts and provided other reassurances using charts and statistics about SunEdison's assets that he displayed on a screen sharing platform on Wexford's web site.  Borruso said he expected Dr. Gelman's investment in SunEdison to yield substantial profits.

30.     In fact, however, as Respondents knew or should have known, there were widespread reports that SunEdison was in poor financial condition when Borruso invested almost all of Dr. Gelman's funds in SunEdison.  Rather than disclose the poor financial condition of SunEdison to Dr. Gelman, Respondents, acting through Borruso, portrayed SunEdison as a strong investment.

31.     On February 10, 2016, Latin American Power BC ("LAP") filed suit in New York Supreme Court claiming that SunEdison had breached an agreement to purchase for $733 million, and sought a temporary restraining order barring the transfer of SunEdison's assets.  The next day, on February 11, during the trading day, the court granted the temporary restraining order, barring SunEdison from making unusual transfers of its assets.  By the close of trading on February 12, SunEdison's stock had dropped 40%.  Journalists and analysts following SunEdison attributed the decline in the stock to the temporary restraining order.  As the Business Finance News reported on February 12, 2016, "Sun Edison Inc. . . . Crashes . . . as Court Blocks Asset

Transfer.  That same day Seeking Alpha reported that "SunEdison plunges below $2 in wake of restraining order."

32.     Respondents met this news with a series of large purchases in Dr. Gelman's accounts, buying 14,200 shares of SunEdison on February 16, and another 2,800 shares on February 17.

33.     More bad news followed on February 29, 2016, when after trading, SunEdison announced it would delay the filing of its annual report on SEC Form 10-K in part because of an investigation its Audit Committee was conducting into the accuracy of the Company's anticipated financial position and liquidity.  Analysts responded negatively:   Oppenheimer downgraded SunEdison on February 29, Deutche Bank Suspended coverage of SunEdison on March 1, Credit Suisse described SunEdison's financial position as precarious and Axiom downgraded SunEdison because the company was in financial distress.  In response, SunEdison's stock dropped another 24% on March 1.

34.     On March 2, 2016, after the close of trading, SunEdison suspended its quarterly dividends.  SunEdison's stock dropped another 15% in response.  Then, on March 11, SunEdison announced that its CFO would resign and be replaced.

35.     Respondents again met bad news with increased purchases in Dr. Gelman's accounts, buying 21,500 shares of SunEdison's stock between March 8 and March 15, on the recommendation of Borruso.

36.     More bad new followed for SunEdison on March 16, when SunEdison announced further delays in the filing of its annual report on SEC form 10-K, due in part to "material weaknesses in its internal controls over financial reporting."  Then on March 22, SunEdison announced that it was exploring Debtor-in-Possession financing.  Its stock dropped another 26%

in response.  Respondents again met bad news with further purchase, buying 5,000 shares of SunEdison on March 22 and 16,000 shares on March 23.

37.     In the period between February 16, 2016 and March 31, 2016, in the face of this bad news and declining stock value, Respondents, acting on Borruso's initiative and recommendations, purchase 95,200 shares of SunEdison for Dr. Gelman's account.  This was an increase of 435% in his holdings of that stock from where it stood on January 31, 2016, when he owned 17,800 shares.

38.     When Dr. Gelman received his statements for the period ending March 31, 2016, he was shocked to see that Borruso had invested 121% of Dr. Gelman's funds in SunEdison's stock.  In addition, he was dismayed to see that his accounts had dropped to $58,259.59 from their value of $404,382 on July 31, 2015.

39.     After SunEdison filed its petition for bankruptcy on April 21, 2016, Dr. Gelman spoke with Borruso by telephone about his losses.  Borruso apologized and said that Dr. Gelman had the right to sue him.  But Borruso also provided reassurances, saying that SunEdison's stock might still appreciate after the bankruptcy as he claimed had happened with other companies.  However, after the bankruptcy SunEdison's stock continued to decline.

40.     As a result of Respondents' unsuitable investment of Dr. Gelman's funds, the value of Dr. Gelman's accounts fell from $404,382.00 to $12,734.09.

## V.   CLAIMS FOR VIOLATIONS OF LAWS, RULES AND REGULATIONS

### A.   Churning in Violation of the FINRA Rules, Exchange Rules, SEC Rules 10b-5 and 15c1-7(A) and the Florida Securities Act, F.S.A 517.301

41.     Respondents' engaged in churning by making excessive trades, that generated commissions for respondents in excess of $32,000, without creating any benefit for the customer,

Dr. Gelman, who lost hundreds of thousands of dollars on the trades, as described in detail above.

42.     Churning exists, when: (a) the broker exercised control over the trading account; (b) trading in the account was excessive in light of the customer's investment objectives, and (c) the broker acted with intent to defraud or with willful and reckless disregard of the customer's interests.  That is the case here.

43.     The allegations above show Borruso controlled the account.  First, he solicited Dr. Gelman's account by touting his experience managing investments for doctors who are too busy to manage their own investments, and Dr. Gelman agreed to transfer his funds to LPL because, as he told Borruso, he lacked the expertise and time to make his own informed investment decisions.  Second, Borruso initiated all the purchases and sales, consulting Dr. Gelman on some, but making others without even consulting him or obtaining his permission.

44.     The turnover rate, described above, shows that the trading was excessive.

45.     Respondents' intent to defraud or willful and reckless disregard of Dr. Gelman's interests is apparent from:  (a) the concentration of Dr. Gelman's stock in SunEdison, a company completely unsuited to the investment goals stated in the account opening documents, (b) the loss of virtually all of Dr. Gelman's investment with LPL, (c) the misstatements Respondents made about the financial strength of SunEdison in the face of widespread publicly available information showing SunEdison's precarious financial position,  (d) the excessive commissions, and (e) the velocity of the trading, which makes no sense, other than to generate commissions.

46.     These acts violated the rules of the relevant stock exchanges and self-regulatory organizations, which provide a basis for a churning claim, including:

a. FINRA Rule 2010, which provides:  "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

b. FINRA Rule 2020, which provides:  No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

c. FINRA Rule 2111(a) on Suitability, which provides:  "A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile.  A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation."

d. NASD Conduct Rule 2310, which provides:  "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

14

e.   NASD Rule 2510(a), which provides:  "No member shall effect with or for any customer's account in respect to which such member or his agent or employee is vested with any discretionary power any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account."

f.   NYSE Rule 408(c), which provides:  "No member or allied member or employee of a member organization exercising discretionary power in any customer's account shall (and no member organization shall permit and member, allied member, or employee thereof exercising discretionary power in any customer's account to) effect purchases or sales of securities which are excessive in size or frequency in view of the financial resources of such customer."

47.   Respondents' actions violated Rule 10b-5 of the Securities and Exchange Commission, which provides:  "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

48.   Respondents' actions violated Rule 15c1-7(a)  of the Securities and Exchange Commission, which provides:  "The term manipulative, deceptive or other fraudulent device or

contrivance, as used in section 15(c) of the Act, is hereby defined to include any act of any broker, dealer or municipal securities dealer designed to effect with or for any customer's account in respect to which such broker, dealer or municipal securities dealer or his agent or employee is vested with any discretionary power any transactions or purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account."

49.     Respondents' actions violated the Florida Securities Act, F.S.A. 517.301(a), which makes it unlawful for any person rendering investment advice in connection with the sale or purchase of any investment or security:  "1. To employ any device, scheme or artifice to defraud;  2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or  3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

**B.      Recommending Unsuitable Investments in Violation of the FINRA Rules, Exchange Rules, SEC Rule 10b-5 and the Florida Securities Act, F.S.A 517.301**

50.     Respondents recommended and purchased securities that were unsuited to Dr. Gelman's needs by concentrating all his investments in the stock of SunEdison, which was inconsistent with his stated investment objectives of growth with income for retirement over a 5-10 year horizon.

51.     Respondents also recommended and purchased securities that were unsuited to Dr. Gelman's needs prior to concentrating all his investments in the stock of SunEdison, by recommending and purchasing investments that did not achieve and were not designed to achieve the objectives of growth with income for retirement over a 5-10 year horizon.

52.     Respondents knew Dr. Gelman's investment objectives, because they were stated in the account opening documents that Respondents enclosed with their welcome letters to Dr. Gelman.  Respondents also knew, because of the expertise in financial markets and investing that they claim on their web site, that the stocks they purchased for Dr. Gelman would not meet his investment objectives.

53.     Respondents controlled Dr. Gelman's accounts, making recommendations for all the investments made on their own initiative, and in many cases making trades that Dr. Gelman had not authorized, as described above.

54.     Respondents, through Borruso, made material misrepresentations, described above, about the financial soundness of SunEdison, and omitted material negative information about SunEdison, also described above, when recommending and purchasing investments in SunEdison for Dr. Gelman.

55.     Respondents also intentionally omitted to inform Dr. Gelman that the other investments they recommended, through Borruso, were not suited to Dr. Gelman's stated investment objectives.

56.     Respondents took these actions and inactions with the intent to generate excessive commissions and in reckless disregard of Dr. Gelman's interests

57.     Dr. Gelman justifiably relied on the false statements and omissions of material fact because Respondents claimed to have superior expertise in financial markets and investing, claimed to be acting in Dr. Gelman's best interest and were in fact bound to act in his best interest.

58.     Respondents' unsuitable investment of Dr. Gelman's funds violate the statutes, rules and regulations, quoted above in the churning claim at paragraphs 46, and 48-49 above.

C.      **Failure to Supervise in Violation of FINRA Rules**

59.     Respondents LPL and Wexford had a duty to supervise Borruso under FINRA

Rules including FINRA Rule 3110, which provides:  "Each member shall establish and maintain

a system to supervise the activities of each associated person that is reasonably designed to

achieve compliance with applicable securities laws and regulations, and with applicable FINRA

rules."

60.     Respondents failed to use due care in carrying out their supervisory

responsibilities by allowing Borruso to make unauthorized trades, make excessive trades,

generate excessive commissions and make unsuitable investments.

D.      **Common Law Fraud**

61.     Respondents' actions constitute common law fraud because Respondents made

misrepresentations of material facts, and failed to disclose material facts they had a duty to

disclose, with intent to defraud or reckless disregard for the truth or falsity of their statements, on

which Dr. Gelman relied, and which caused Dr. Gelman's damages, all as detailed above.

E.      **Breach of Fiduciary Duty**

62.     Respondents' actions constitute breach of fiduciary duty because:  (1) as

investment advisors and brokers for Dr. Gelman, Respondents assumed a position of trust in

which they had a duty to exercise the utmost good faith and loyalty toward Dr. Gelman; (2)

Respondents' actions breached those duties by churning and making unsuitable investments; and

(3) Dr. Gelman suffered damages as a direct result of those breaches.

F.      **Breach of Contract**

63.     Respondents' actions constitute breach of contract because Respondents: (1)

agreed to invest Dr. Gelman's funds with the objective of growth and income for retirement with

a 5-10 year horizon, (2) Dr. Gelman performed his part of the agreement by investing with

Respondents, paying fees and commissions, (3) Respondents breached the agreement by making investments of Dr. Gelman's funds that did not meet those objectives; (4) which breach caused Dr. Gelman to suffer the loss of his funds through those improper investments

64.     Respondents also breached their agreements with FINRA, which were for the benefit of their customers, including Dr. Gelman, by churning Dr. Gelman's account, making unsuitable trades, engaging in schemes and artifices to defraud, violating securities laws, failing to exercise due care in carrying out their supervisory responsibilities and violating FINRA and Exchange rules.

**G.     Negligent Misrepresentation**

65.     Respondents' actions constitute negligent misrepresentation because: (a) they misrepresented that the investments they made for Dr. Gelman were suitable and they misrepresented that SunEdison was a sound investment; (b) Respondents either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known of the falsity; (c) Respondents intended for Dr. Gelman to act on the misrepresentations; and (d) Dr. Gelman was injured in justifiable reliance on the misrepresentations.

**H.     Equitable Remedies**

66.     As FINRA's Arbitrator's Guide states on page one, quoting Domke on Aristotle: "Equity is justice in that it goes beyond the written law.  And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reason why arbitrators were appointed was that equity might prevail."

67.     Under the principles of equity that FINRA endorses in its arbitrations, Dr. Gelman seeks a remedy that will make him whole, by returning to him the money he invested, with the investment return it would have earned had Respondents honorably discharged their duties,

including the tax benefit he would have obtained from having his investment in a retirement account, as well as an award of attorneys' fees and the costs of this arbitration.

## VI.    REMEDIES

Claimant seeks the following remedies:

A.    Compensatory damages, giving him the value of a well-managed account as of the date of the arbitration award, plus the tax benefit he would have earned from having the funds invested in a retirement account, in an amount subject to proof at the arbitration hearing, but anticipated to be in excess of $550,000;

B.    Punitive damages, in the amount of $5,000,000;

C.    Attorneys' fees, under the Florida Securities Act, F.S.A. 517.211(6), and FINRA Code 12904(e)(8);

D.    The fees and costs of this arbitration; and

E.    Such further relief as the arbitrators deem just and equitable.

Dated:  New York, New York
        March 28, 2018

HARWOOD LAW PLLC

By: s/Anthony J. Harwood
Anthony J. Harwood
488 Madison Avenue, 18th Floor
New York, New York 10022
212-867-6820